Good morning everyone. This is Kelly and I would like to again welcome and thank Judge Waters from the District of Montana for sitting with us. Thank you, Judge Waters. Thank you. The first two cases, Purcell in the United States v. Gettysburg have been submitted on the briefs. The first case on calendar for argument is Eftenoff v. Ryan. Counsel for appellant, please approach and proceed. Good morning. May it please the court, I'm Colleen Merring on behalf of appellant petitioner Brian Eftenoff. Mr. Eftenoff stands before this court convicted of murder and of a cover-up of that murder, but there was no murder. The jury would have known that there was no murder, or more relevantly, a single juror, at least one juror, would have had reasonable doubt whether there was a homicide. And Mr. Eftenoff's counsel did one or both of two things that he was constitutionally obligated to do. Counsel, we are here on the avias. We're not here in direct appeal. Yes, Your Honor, but that is the standard for prejudice. In an effective assistance claim, in a unanimous jury verdict state like Arizona, he is shown prejudice if he can show that at least one juror. And there's a procedural issue as well, is there not? Yes, Your Honor. What's up with that? Yes, so one of the two claims is procedurally defaulted. That claim was not raised by post-conviction counsel. That's what I referred to in the briefs as the pathology IAC claim. Mr. Eftenoff was convicted not only on the basis of the toxicology evidence, but when counsel allowed the jury to hear evidence that the autopsy results were inexistent. But Mr. Eftenoff's defense? Yes, when you go for an ADIU, is the autopsy results to claim the procedurally defaulted claim, you're no longer pursuing it? Yes, we are very much pursuing it. What was the cause to excuse the procedural defaulted claim? Under Martinez v. Ryan, the cause for the procedural default was the ineffective assistance of post-conviction counsel. This claim was clearly stronger than the claim she did raise in post-conviction. And under Davila, as my 20HA letter points out, and under the other cases cited in the briefs, because she chose to raise weaker claims than she could have, that's ineffective assistance, that's deficient performance. And why isn't that transferred? Even if counsel collects to pursue a claim that may be weaker, why isn't counsel given an effort to make the decision as to which strategy to pursue? Well, the Supreme Court of the United States says post-conviction counsel cannot choose to put forward a plainly weaker claim than counsel could have, and that is deficient performance. What case is that? Davila v. Davis is cited in my 20HA letter submitted. What is it? Davila, D-A-V-I-L-A, v. Davis. Is that in my second case, the Supreme Court case? That is the Supreme Court case, 137, Supreme Court, 2058. And that was already, I think, clear from Wiggins v. Smith, another Supreme Court case, and the circuits. Well, but Davila declined to extend quarantine as a rule. To the two ineffective assistance appellate counsel, that's not an issue here. What I say Davila for is the proposition that you can tell whether post-trial counsel has performed efficiently by weighing what are the claims they did raise versus what could they have raised. Well, in this case, trial counsel called the medical examiner and expected to achieve his strategy through him, and if it were, if he were successful in that, that would have been pretty powerful evidence, wouldn't it? I agree with you that trial counsel attempted to achieve his strategy through one of the medical examiners, but this court recently reaffirmed in Whedon that the investigation must be the strategy, not the other way around. Trial counsel failed to investigate the pathology evidence. He just showed up in a defense interview. One of the enemies said something helpful, and that was what he did. He went with his pre-elected strategy. He had a constitutional obligation to first investigate and see whether an independent expert could have resolved that debate between the medical examiners, and given the jury that evidence, that in fact the pathology results were inconsistent with the state's theory of homicide, and in fact were consistent with the accidental cocaine overdose that occurred. In your 28-J, you quoted or cited Davila for the excuse of the default on the Martinez. You didn't make the specific argument that you're making here that failure to raise a wager claim is, in effect, inconsistent with counsel. So where are the keys? What language are the keys that you're relying on to support the argument you're making now? I am making the same argument. I apologize for not being clear. There's two levels, of course, in Martinez of ineffective assistance, and what I hope is clear is that Davila demonstrates the post-conviction counsel ineffective assistance. Right. I asked you why I wasn't getting permissible trial strategy. You said the pursuit of a quicker strategy is, per se, ineffective assistance of counsel. And I asked you for keys to say that. You said Davila. Okay, so now I'm asking you to point me to the language in Davila that supports the proposition that a pursuit of a quicker theory of the case is ineffective assistance of counsel. Where is that language? I am only relying on it for post-conviction counsel's ineffectiveness. I am not relying on Davila for trial counsel's ineffectiveness. Okay, so then do you have a case that supports your argument that you may get relied on a quicker theory of the case is, per se, ineffective assistance of counsel? I apologize for the confusion here. Trial counsel was ineffective because he failed to investigate. That's the Whedon case. Well, actually, did he pursue a quicker theory or a quicker strategy? No, post-conviction counsel pursued a weaker post-conviction claim. Trial counsel failed to investigate. Post-conviction pursued a weaker claim. Which are you relying on, trial or post-conviction cases? I think to meet my obligation under Martinez, I have to make the showing of both. I have to show that post-conviction counsel was ineffective at failing to raise the claim and that the underlying claim has legitimacy, has some merit, I believe is the standard. So I have to make this just the showing that if post-conviction counsel is ineffective by not raising it in post-conviction, that excuse is default, then this court can review the underlying trial ineffective assistance of counsel claim de novo because there's no ambidextrous because the Supreme Court never heard it. And at that point, I rely on Whedon and the other cases in the briefs to say that trial counsel had a duty to investigate the pathology evidence and he failed in that duty and that was more judicial. But if he opted to use the state's witness and to his advantage, why is that effective? Because he elected a strategy without investigating and the Strickland jurisprudence makes clear that trial counsel's duty to investigate must guide strategy, not vice versa. They've been in duty to make a reasonable investigation. And relying on the state's case to attack the state's case is not a sufficient investigation when he has evidence and when his own client presents him with evidence. This is in the petition. It's not evidence in the record. But when his own client asks him to consult an independent pathologist and says, an independent pathologist told me, and when he hears the medical examiners arguing with each other and the medical examiners could not even medically rule this death a homicide, that counsel has to go out and at least ask another pathologist, look at this, is this right? And when that happened in this case, Dr. Drescher was asked that and he testified that the autopsy shows the state's theory of homicide is impossible medically or is medically impractical. Well, counsel, with regard to the ineffective assistance claims, what about the fact that in the post-conviction relief hearing, after enough expert testimony, he had an independent pathologist and his testimony at that hearing largely mirrored the trial testimony of the state medical examiner, Dr. Moosley? I think there were very important differences. I'll point out two. One, Dr. Moosley testified at trial that the blow to the back of Judy's head would have rendered her unconscious. If that happened, it's very hard for a jury to figure out how a woman falls backwards on her head, remains unconscious, does not regain consciousness, and then somehow ends up in a death position kneeling forward. Two, Dr. Dressler testified, which no one else had before, that the contents of Judy's stomach affirmatively disproved the state's theory of homicide. You couldn't have that low of a concentration of cocaine and have just recently swallowed cocaine. I would like to reserve a majority of that testimony. No, that only came out in post-conviction. Those were two differences between what happened at trial and what happened in post-conviction. I would like to reserve time for about all your other questions. Thank you. Good morning, Your Honors. Julie Doan from the Arizona Attorney General's Office, representing Respondent Charles Ryan. The state obviously disagrees and believes that trial counsel didn't challenge the evidence, but Mr. Epinoche is not saying it was not a challenge to a trial. As two of your honors have pointed out, it was a better trial strategy for trial counsel to call in Booth's co-witness, the medical examiner, Dr. Mosley, who actually performed the autopsy in this case and attempted to see if I was a juror, and you have to look at what a reasonable, you know, whether one juror could have found a difference. If I was a juror, having the state not call the medical examiner who performed the autopsy and attended the scene, I question why is the state not calling them? Why is the defense calling them? There must be a problem with the state's case. So that's why we would argue that it was a stronger and strategic decision not to respond to a opposing counsel's argument that, at a minimum, that his counsel should have investigated with an independent pathologist before deciding on a strategy of calling the state's clinical examiner. The trial counsel did testify at the PCR hearing that he interviewed both Dr. Mosley and Dr. Keene. Granted, he had not talked to an independent pathologist, but he had at one point, he couldn't remember the timeline, talked to Dr. Karch, who is a toxicologist. But in this case, a review of the record reveals that the toxicologist and the pathologist think kind of blended into each other. In fact, Dr. Dressler at the PCR, who was a pathologist, talked about some of the stuff that the toxicologist would have testified to, and the trial counsel testified at the PCR hearing that he did get some information from Dr. Karch regarding some of the pathological evidence, in addition to mostly regarding the toxicology evidence to provide Dr. Dressler's testimony. But he did have an expert that he consulted with, and then he also interviewed Dr. Keene and Dr. Mosley. And at the PCR hearing, he testified that he found that Dr. Mosley and Norman Wade, the toxicologist who prepared the results that went with the autopsy, again, a neutral witness who the defense called. He thought they were very credible witnesses. Where was Dr. Dressler fit into this picture? Dr. Dressler was the pathologist that PCR counsel called to testify at the PCR hearing. Dr. Dressler, for the most part, testified consistent with Dr. Mosley's testimony, who Dr. Mosley also testified again at the PCR hearing. Regarding the hemorrhages in the neck, Dr. Mosley testified that he did not think that they were necessarily from a finger being put pressure on the neck, as Dr. Keene testified to, who was called by the state at trial. He said they were too deep down in the larynx to have been caused by that. Dr. Dressler, the differences in Dr. Dressler's testimony, one of the things he said was it would be impossible for an unconscious person to swallow cocaine. The problem with that, with counsel saying that's new evidence, is the states never argued that Judy was unconscious. There was evidence at trial that the blow to the back of the head, when the daughter testified, she saw them fight in the kitchen, and Judy hit the back of her head. And Mr. Ashtonoff carried Judy into the bathroom on the night of her murder. They said it could have caused unconsciousness. There was testimony that she was unconscious when the cocaine was ingested. So that was an issue with Dr. Dressler's testimony, as he was presuming the state's theory was that Judy was unconscious, and the state had never argued that. Also, who was the expert pathologist that the defense counsel consulted? The PCR hearing. He described it as a PCR hearing. Who was the doctor? Can you name the doctor? Well, Dr. Mosley. Well, the expert that he consulted, he said. Are you talking about the PCR counsel? When I asked you about today to investigate, you responded that he consulted with an expert. Oh, no, with Dr. Karch, who was the toxicology expert, who he called at trial. Oh, I'm sorry. He consulted with an expert before he made the decision to rely on a medical examiner. That's not what you were saying. Well, kind of it. Based on his testimony, the trial counsel's testimony at the PCR hearing, it sounds like he wasn't exactly sure of the timeline of when he hired Dr. Karch, who was a toxicology expert, but he said that he got some information from Dr. Karch regarding the pathology evidence, too. And it seems like, like I said, based on a review of the record, a lot of the experts seem to bleed over into one area or the other. Who was Dr. Karch? Was Dr. Karch qualified as a toxicologist to give these pathologist opinions during the investigation by trial counsel? At a minimal level, just like Dr. Dressler, who was a pathologist called by PCR counsel in the PCR proceedings, gave some testimony regarding the toxicology and the cocaine and how it metabolizes in the system, but he admitted, you know, I have a minimal understanding of that. So that's what I'm talking about, how some of the experts kind of bleeded into each other's study. I'm trying to get down precisely where the arguments come from each other. You've heard counsel saying that there was ineffective assistance for failure to investigate, and now you're saying that, no, he did, in fact, investigate. Is that what you're saying? Well, he didn't dissolve the independent pathologist, but my argument would be that doesn't mean he didn't investigate. Well, what's the evidence that he investigated? Well, he interviewed both Dr. Mosey and Dr. King. There wasn't any testimony at the PCR hearing, what he did further than that, on this claim, because this claim was never raised in PCR. So that's why there's no testimony directly to that issue in the PCR hearing. So what I would like to point out, she says that there's absolutely no evidence of murder, but Mr. Ashdorff continues to ignore all the items that the experts agreed upon, that she did ingest a lot of cocaine shortly before she died, that she died of a stroke due to cocaine intoxication. And the jury heard that the manner of death was ruled undetermined, that wasn't newly presented in the PCR. Dr. Mosey testified to that. None of the experts went upon how the cocaine was introduced into Judy's system. Her heart was of normal size, so there was no indication that she was a chronic cocaine user or a co-core, as Mr. Ashdorff kept referring to her. And then there's also all the other non-scientific evidence. The fact that Ashdorff had previously forced Judy to swallow drugs, you know, holding her by the throat near an elevator in Las Vegas and forcing her to swallow an Epstein pill, that he had made statements before the autopsy reports were released that he knew there was a considerable amount of, or a significant amount of cocaine in Judy's body, that Judy died of a cocaine overdose, and that the toxicology reports would clear him. He also made statements to the lead detective on the case that because of the amount of cocaine that all the experts agreed, there was a large amount of cocaine in her system, it had to have been forced on her. That was a voluntary statement that Mr. Ashdorff made when he contacted the detective. And he also inquired as the detective, well, how do you think it was administered? Do you think it was injected? Could it have been started? Could it have been forced on her? And then Ashdorff's daughter, Ricky, who saw them fight on the night of the murder, saw Mr. Ashdorff carry Judy's body into the master bathroom. Ricky had testified about other domestic violence that she'd seen between her parents. There were arguments over money. Ricky testified that she heard Mr. Ashdorff say to Judy after he carried her body into the bathroom, I'm done with this thing, the boss. Mr. Ashdorff told other people that it was okay to hit tomboys and that Judy was a tomboy. Ashdorff kept giving his friend Nick money at the casino, presumably to keep him there at the casino to keep gambling, because Nick testified he would have wanted to leave. Otherwise, in fact, he missed his flight that day because they stayed so long. Judy's injuries were consistent with the struggle, as Dr. King testified. As Mr. Ashdorff signaled to the nanny the morning of the murder by drawing his finger across his throat that Judy was dead when the nanny was being interviewed by another officer, Mr. Ashdorff made statements continually that Judy was a co-corps and no co-corps was going to raise his children. He asked Detective Petrosino, also regarding the cocaine, he asked whether it goes down or it dissipates like alcohol. Mr. Ashdorff was the last person to see Judy alive. Nick never saw Judy that night when he came over to pick up Mr. Ashdorff. Then Mr. Ashdorff testified that Judy put the kids to bed that night, but Ricky said no, her dad did, Mr. Ashdorff did. So Mr. Ashdorff's arguments ignore all this other evidence the jury heard. The jury heard the conflicting evidence between the medical examiners, including the medical examiner, the state's medical examiner, who was called by Mr. Ashdorff. And then they also heard from Dr. Karch, the toxicologist hired by Mr. Ashdorff at trial. So the jury heard this evidence in addition to all this other damning evidence, and then again the PCR court heard this evidence, who was also the trial judge, and then sat through the trial. And both of them still found that he was guilty of murder. Thank you, Kelsey. You've saved your time. We'll give you a minute for rebuttal. Your Honors, first, the pathology claim counsel never investigated. If this court needs more evidence, then the appropriate action would be to remand for a Martinez hearing to take evidence on that claim. Counsel, is your theory that the investigation would necessarily include consultation with an independent pathologist? In this case it would, yes. Do you have a case that says that when a judge is being accused of being, of performing an equity investigation, consultation with an independent expert is required? There are a few in this circuit, Duncan, View, Ornowski. Well, we're on Habeas, so we would need a Supreme Court case. Given that you would review that case de novo, the claim de novo, because it has been defaulted, I think you can rely on circuit opinion, but there's lots of Supreme Court opinions. What's your strongest one that says that investigation requires consulting an independent expert? Probably the recent Hinton case in the Supreme Court. Hinton? Hinton, Anthony Ray Hinton. And I would just say it's the other evidence of homicide. It cannot overcome scientific evidence that no homicide occurred. No matter how guilty Brian seemed, no matter how unlikable he was, his unlikability probably increased the likelihood of a miscarriage of justice. But none of the circumstantial evidence, all of which is contested. Counsel, I'm looking at Hinton. Hinton, would you point me to the language in that case that you rely on to support the proposition that consultation with an independent expert is required? Okay, Hinton, as in these other cases. Could you just point me to the language that you rely on to support the proposition that I'm sorry. I pointed you to the wrong piece. In all of these cases, counsel has done defense interviews, and so any time you find a case where the Supreme Court or the circuit is telling a lawyer you have to contact an expert, counsel's explanation is that, oh, it's okay to investigate simply by showing up to a defense interview. In all of those cases, any time you see a Supreme Court or a Ninth Circuit decision saying you have to consult an expert, that is consulting an independent expert. The clearest on point, again, these clear, precise holdings are rare, because actual innocence is rare. It's rare that you can actually disprove that a crime ever happened. But I would, the Hinton case certainly discusses the need to obtain an expert. And... Wait a minute. You just said a moment ago that Hinton was not the case. It doesn't say independent expert. It doesn't say that you need to go obtain an independent expert. Okay, well, I'm slightly confused. What's your response to any problems with the question? What's your strongest case? I don't know that the Supreme Court has ever precisely held that there is a duty to counsel an, quote, independent expert. But it is time and again said the defense counsel has a duty to consult experts in certain circumstances, including it says that in Hinton. I think it says that in Ramila as well. And when you see that language, in all of those cases, defense counsel did do defense interviews of the state experts. So that must mean you have to consult an independent expert because you did show up to a defense interview. So the Supreme Court must be saying that's not what we're saying. You have to go out and consult an expert. Thank you, counsel. Thank you both, counsel. These issues are to be submitted for decision by the court.
judges: O'scannlain, Rawlinson, Watters